UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.                                        Case No. 3:26-CR-94 (VDO)

JOHN O'ROURKE                              August 6, 2026

### JOHN O'ROURKE'S MEMORANDUM IN AID OF SENTENCING

In January 2021, John O'Rourke returned home one night and discovered that ███████████ ████████████████████████████ Mr. O'Rourke, then 22 years old, was recovering from a serious car accident that had shattered his pelvis and broken his back. ██████████████ ███████████████████████████████████████████ ████████████████████████████████████████ has defined the past five years of Mr. O'Rourke's life as he continues to wrestle with overwhelming grief and guilt.

████████████ triggered a downward spiral for Mr. O'Rourke. Faced with ongoing physical limitations and emotional anguish, Mr. O'Rourke began abusing drugs and alcohol and, as he readily admits, making poor decisions. As his life descended further into chaos, he traveled to the United States, was deported, and then returned illegally. Mr. O'Rourke takes full responsibility for his offense and deeply regrets his illegal reentry into the United States. The past five months in detention have been a period of critical self-reflection for Mr. O'Rourke. He has no desire to ever return to the United States and is focused on rebuilding his life in the United Kingdom on a new foundation.

Mr. O'Rourke's identity as an Irish Traveller is a crucial part of his story. While few Americans have heard of Irish Travellers, this ethnic minority community faces some of the highest rates of poverty, suicide, and incarceration of any group in the United Kingdom. Mr. O'Rourke's experience as a perpetual outsider in the U.K. has defined many facets of his life.

At this point, Mr. O'Rourke is focused on rebuilding his life and not repeating his past poor decisions. He plans to spend time with his young children, care for his aging parents, and engage in psychological counseling and addiction treatment. His reintegration can only happen once he returns home, and he is eager to take these strides forward.

Mr. O'Rourke is in Criminal History Category I and has an offense level of zero. PSR ¶ 27, 33. He respectfully asks the court to impose a Guidelines sentence (between zero and six months). He asks that his sentence run concurrently with any yet-to-be-imposed state sentence, except for 10 days consecutive, as agreed to by the parties in the plea agreement. Doc. #21 at 6. The proposed sentence is the sentence sufficient but not greater than necessary to serve the purposes of sentencing under 18 U.S.C. § 3553.

### HISTORY, CHARACTERISTICS, AND OFFENSE CONDUCT

**A. As an Irish Traveller, Mr. O'Rourke experienced discrimination, dislocation, and trauma during childhood.**

John O'Rourke (then John Casey) was born in November 1998 to an Irish Traveller family in Surrey, U.K. His parents, Adeline Casey and John Casey, Sr., grew up in the traditional Traveller way of life, following opportunities for seasonal labor across the U.K. and Ireland and living in caravans with their extended families. PSR ¶ 47; Exhibit D at 4–6 (Teaching Declaration of Dr. Anthony Howarth, hereinafter "Howarth Declaration"). They are devout Catholics and feel a strong sense of pride in their community and culture as Irish Travellers living in the United Kingdom. Exhibit B at 1 (Adeline Casey's letter).

The youngest of four children, Mr. O'Rourke was born a decade later than his siblings. PSR ¶ 49. John Casey, Sr. was self-employed in construction and labored for long hours to support the family. PSR ¶ 50. Adeline Casey worked in the home and cared for the family. *Id.* His parents both

2

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

Another serious source of grief for the family was the loss of the traditional itinerancy practiced by Irish Travellers. During Mr. O'Rourke's early childhood, his family continued to travel in the southeast of England, primarily Surrey and Essex, and in Ireland. They lived in a caravan along with their extended family and friends. But around 2004, when Mr. O'Rourke was 6 years old, his family moved into permanent council housing, similar to public housing in the United States. They did not accept a settled residence by choice. Exhibit B at 1 (Adeline Casey's letter). Rather, changes to UK law made it too difficult and dangerous for them to continue practicing their customary travel. *See* Exhibit D at 7, 11 (Howarth Declaration). After hundreds of years spent moving freely and frequently across the U.K. and Ireland, Travellers endured a deep rupture in their culture and identity in the 1990s and 2000s as new legal regulations largely forced them to stop traveling. *Id.* at 7–8.

Giving up their way of life put tremendous strain on the family. His parents struggled to adapt to their new home, where, in Adeline Casey's words, "the neighbors wouldn't speak to us and made it clear our kind was not wanted." Exhibit B at 1 (Adeline Casey's letter). When Mr. O'Rourke was 10, his parents separated, and he moved with his mother to Burgess Hill in Mid Sussex, where they returned to living in a caravan at times. PSR ¶ 50. Mr. O'Rourke, his sister, and his mother moved between this site and extended family in Ireland until Mr. O'Rourke finished high school at the age of 16. PSR ¶¶ 50, 58.

Irish Travellers were a small minority everywhere Mr. O'Rourke lived and attended school. His culture was poorly understood by his peers. At times, Mr. O'Rourke enjoyed meeting people from outside the Traveller community, but he often felt like an outsider. He describes himself as "easily led," a learned trait of self-preservation as he tried to accommodate others amid the extreme prejudice he faced as a Traveller. PSR ¶ 56.

**B. Irish Travellers endure significant discrimination in British society and suffer from extraordinary disparities in employment, education, health, incarceration, and mental health**.

As Irish Travellers, Mr. O'Rourke and his family experienced ethnic prejudice and discrimination throughout their lives. Exhibit D at 2–8 (Howarth Declaration); Exhibit B at 1 (Adeline Casey's letter). In the United Kingdom, Irish Travellers are recognized as a distinct ethnic group, but the government sometimes includes them in the broader demographic class of Gypsy, Roma, and Traveller (abbreviated to "GRT"), which "describe[s] people from a range of ethnicities who are believed to face similar challenges." [1] In other instances, the government categorizes "Travellers and Gypsies" separately from "Roma."[2] This inconsistency in the official demographic designations used to refer to Travellers makes it more difficult to document their specific experiences in the U.K. Nonetheless, a recent public study of discrimination against protected groups in the U.K. found that 44% of people in Britain "expressed openly negative feelings" towards Gypsies, Roma, and Travellers.[3] For context, Muslims came second on this list, about whom 22% of people in Britian are

---

[1]Cabinet Office: Race Disparity Unit, *Gypsy, Roma and Irish Traveller ethnicity summary*, (Last updated March 29, 2022), https://www.ethnicity-facts-figures.service.gov.uk/summaries/gypsy-roma-irish-traveller/,
[2] *Id.*
[3] Equality and Human Rights Commission, Research Report 119, *Developing a National Barometer of Prejudice and Discrimination in Britain,* at 10 (October 2018), https://www.equalityhumanrights.com/sites/default/files/national-barometer-of-prejudice-and-discrimination-in-britain.pdf.

likely to express negative views openly.[4] Discrimination against Travellers is both widespread and unabashed in daily life and the British media. *See* Exhibit B at 2–4 (Howarth Declaration).

In this climate of open hostility, Travellers experience a wide range of social and economic disparities. It is often difficult for Travellers to find work. Exhibit D at 8–9 (Howarth Declaration). Members of the community experience stark inequalities in education, health, and socio-economic outcomes. Exhibit D at 7–9 (Howarth Declaration). They also experience some of the highest rates of incarceration of any community in the U.K. Exhibit D at 9 (Howarth Declaration). Recent government figures show that Gypsies, Roma, and Travellers make up about 0.3% of the population in England and Wales, but account for 5% of the male prisoner population.[5] Similarly, Gypsy, Traveller, and Roma, and Traveller are children are 0.4% of the youth population in England and Wales but account and 9% of the youth in custody.[6] Gypsy, Romany, and Traveller men in the U.K. are incarcerated at a rate of 16.67 times their share of the population and 22.5 times their share of the youth population.[7] For comparison, Black Americans are 13.5% of the U.S. population but make up 38.5% of Bureau of Prisons inmates, meaning that they are overrepresented at a rate of 2.85 times their share of the

---

[4] *Id.*

[5] Office for National Statistics, *Gypsy or Irish Traveller Populations, England and Wales: Census 2021* (Oct. 13, 2023), https://www.ons.gov.uk/peoplepopulationandcommunity/culturalidentity/ethnicity/articles/gypsyoririshtravellerpopulationsenglandandwales/census2021; Office for National Statistics, *Roma populations, England and Wales: Census 2021*, (Oct. 30, 2023), https://www.ons.gov.uk/peoplepopulationandcommunity/culturalidentity/ethnicity/articles/romapopulationsenglandandwales/census2021; HM Chief Inspector of Prisons, *Annual Report 2019-20*, at 42 (2020), https://cdn.websitebuilder.service.justice.gov.uk/uploads/sites/19/2025/08/HMI-Prisons_Annual-Report-and-Accounts-2019-20-WEB.pdf.

[6] Dep't for Educ. (UK), Schools, Pupils and Their Characteristics: Academic Year 2019/20 (last updated Feb. 2, 2021), https://explore-education-statistics.service.gov.uk/find-statistics/school-pupils-and-their-characteristics/2019-20#section-ethnicity; Her Majesty's Inspectorate of Prisons, *Children in Custody 2018-2019* (February 2020), at 11, https://dera.ioe.ac.uk/id/eprint/35006/1/Children-in-Custody-2018-19-Web-1.pdf.

[7] *Id.*

population.[8] Such extreme overrepresentation in the criminal justice system reflects and reinforces damaging stereotypes about Travellers from childhood forward. It also underscores the way in which this community is heavily policed from a young age, and that some traditional practices such as having no fixed address or frequently moving across borders are criminalized. Exhibit D at 6, 9 (Howarth Declaration).

Irish Travellers also face some of the highest rates of suicide and lowest life expectancies in the U.K. *Id.* at 9. ██████████████████████████████████████

████████████████████████████████████████████

██████████████████ Exhibit C at 2 (John Casey, Sr.'s letter); Exhibit B at 2 (Adeline Casey's letter). High suicide rates have been found among other ethnic communities around the world in the wake of the rapid erosion of their traditional practices. Exhibit D at 9 (Howarth Declaration). Given the endemic discrimination Travellers face, the community has a deep distrust of medical professionals. *Id.* at 10. The norms of the Traveller community discouraged Mr. O'Rourke and other young Travellers from engaging with professional mental health care out of shame that asking for help, particularly from outsiders, is emasculating. Exhibit C at 2 (John Casey Sr.'s letter). Moreover, Irish Travellers often face significant stigma from healthcare providers, which makes getting effective mental health treatment even more difficult. Exhibit D at 9–10 (Howarth Declaration). The startling figures point to the extreme disparities in accessing health care and mental health treatment.

---

[8] U.S. Census Bureau, *QuickFacts: United States, Black Alone, Percent (V2025)*, https://www.census.gov/quickfacts/fact/table/US/RHI225225 (last visited Aug. 5, 2026); Fed. Bureau of Prisons, *Inmate Race*, https://www.bop.gov/about/statistics/statistics_inmate_race.jsp (last visited Aug. 5, 2026).

**C. Mr. O'Rourke's entry into adulthood was marked by trauma, violence, and tragedies, which he did not adequately address through treatment.**

*1. Despite some promising achievements, Mr. O'Rourke struggled as a teenager.*

Throughout Mr. O'Rourke's childhood, he helped his father with residential construction and masonry jobs. He planned to follow in his father's footsteps and work in the building industry. Mr. O'Rourke completed the equivalent of a high school diploma at age 16 and received a Level 2 qualification in bricklaying. PSR ¶ 58. Mr. O'Rourke solicited bricklaying and building work informally, passing out fliers and knocking on doors.

Despite these achievements and goals, Mr. O'Rourke struggled. He felt the extreme discrimination of English society after he moved into settled housing and left behind the tight-knit communal support system of his extended family and friends. His sense of isolation grew worse as he got older. His parents' separation was considered deeply shameful by the standards of the Traveller community and placed a significant strain on Mr. O'Rourke in adolescence. Exhibit D at 10 (Howarth Declaration); PSR ¶ 93. He started to experience depression and anxiety around the age of 12 and began hanging out with older boys, sometimes in their late teens or early twenties. PSR ¶ 55. As his mother put it, Mr. O'Rourke began to "look for acceptance from these older boys and men" in his father's absence and began using alcohol and marijuana with them. Exhibit B at 2 (Adeline Casey's letter).

When Mr. O'Rourke was 14 years old, he met Nora and quickly fell in love. Like Mr. O'Rourke, Nora was part of the Irish Traveller community, where couples tend to marry far younger than other people in the U.K. Exhibit D at 10–11 (Howarth Declaration). The two married in 2016, when he was 17 and she was 16. PSR ¶ 52. Their daughter, ███, was born in 2017, when Mr. O'Rourke was 18.

   *2. Mr. O'Rourke began engaging in criminal activity that resulted in prison.*

But Mr. O'Rourke's life had begun to spiral downward in other ways. He had begun getting into trouble with the law starting as a teenager, for offenses such as dangerous driving, driving without a license, and driving without insurance. Exhibit I at 4. At 18, he served a three-year sentence in a Young Offenders Institution following convictions for burglary and theft, burglary with intent to steal, and conspiracy with intent to steal. *Id.* at 5. Mr. O'Rourke's parents still blame themselves for not supervising his behavior closely enough. Exhibit B at 2 (Adeline Casey's letter); Exhibit C at 1 (John Casey Sr.'s letter). But Mr. O'Rourke takes full responsibility for his actions. He looks back with remorse on the poor and immature decisions he made at 17 years old and regrets his willingness to take part in this scheme.

   *3.  A near-fatal car accident left Mr. O'Rourke with life-altering injuries and derailed his plans for the future.*

Determined to make a fresh start after leaving prison, he promised his wife Nora that things would be different when he returned home. Exhibit B at 2 (Adeline Casey's letter). John began taking steps to work on his mental health with his primary care physician. Exhibit E at 1 (Sussex Partnership NHS Foundation Trust Records). Although the couple was committed to making their marriage work, they decided to take things slowly at first. Mr. O'Rourke began working construction jobs with his father and living with his sister. Nora and ▮▮▮ resided with her parents as the couple worked on their relationship.

Just a few months after his release, Mr. O'Rourke was involved in a serious car accident in Essex, U.K., on October 10, 2020. Exhibit F at 1 (Chertsey Health Center Medical Records). Mr. O'Rourke fractured his pelvis and his mid-back. PSR ¶ 53; Exhibit F at 1 (Chertsey Health Center Medical Records). He was hospitalized for weeks and underwent multiple surgeries, including a hip

replacement, to treat his injuries. Exhibit G at 1–5 (Barts Health NHS Trust Records; Exhibit F at 1 (Chertsey Health Center Medical Records).

After his discharge, Mr. O'Rourke could not easily manage on his own in his caravan, given his extensive injuries. Exhibit E at 7 (Sussex Partnership NHS Foundation Trust Records); Exhibit F at 1 (Chertsey Medical Records). His father and sister, as well as Nora and her family, provided him with support and assistance. He received intensive outpatient medical care and often required the use of a wheelchair. Exhibit F at 3–4 (Chertsey Medical Records). This accident permanently impaired his physical health and has made it impossible for him to return to the bricklaying work in which he was trained. PSR ¶ 59. He was prescribed powerful opioid painkillers to manage his ongoing pain post-surgery, which he began to rely on to get through the days, and contributed to his later problems with substance abuse. Exhibit F at 6, 8–9 (Chertsey Medical Records).



████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

████████████████████████████████████ are not aberrations in the Traveller community. Exhibit D at 9, 13 (Howarth Declaration). Just in the six months since Mr. O'Rourke's arrest, ████████████████████████████████████ The mental health crisis has reached an epidemic-level in the Irish Traveller community compounded by discrimination and social disparities. *Id*.

5. *Mr. O'Rourke's substance abuse worsened and his home life became more turbulent.*

About a year and a half after Nora's death, sometime in mid-2022, Mr. O'Rourke began a romantic relationship with Ellen Price. Ellen is also from an Irish Traveller family, and the couple welcomed their son, ████, in July 2023. PSR ¶ 52. Ellen struggled ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████

**D. Mr. O'Rourke committed the federal offense of illegal reentry.**

1. *Mr. O'Rourke reentered the United States after being deported to Canada.*

In the wake of ████████████████████████████ Mr. O'Rourke fled to Canada from the United Kingdom. PSR ¶ 57. In August of 2024, he officially changed his name to John O'Rourke from John Casey in the hope of making a break with the past. PSR ¶ 38. He recognizes now that he could have committed to sobriety, engaged in counseling, sought out mental health treatment, and/or cut off contact with Ms. Price. Exhibit A (John O'Rourke's letter). Instead, Mr. O'Rourke simply left. This decision can be contextualized—though not justified—within the practices of Traveller culture, where mobility and reinvention have long been common responses to defuse family problems. Exhibit D at 12 (Howarth Declaration). Though misguided in retrospect, Mr. O'Rourke's decision was a culturally common response to use movement as a way of deescalating familial trouble.

11

Mr. O'Rourke understands that his decision to leave will have consequences for him when he returns to the United Kingdom. He had not yet finished a term of probation at the time of his departure, and upon return, he will likely be required to serve a period of imprisonment in the U.K., followed by a period of supervision. PSR ¶¶ 37–38. Having had the past five months to reflect and mature, Mr. O'Rourke now welcomes a second chance to engage with the resources for mental health and sobriety counseling available through the U.K.'s prison and probation programs. Exhibit A (John O'Rourke's letter).

After arriving in Canada, Mr. O'Rourke continued to fie████████████████████ PSR ¶ 57. As his father points out, John had every reason to believe these threats were credible, given the inter-familial violence he had witnessed among Travellers. Exhibit A (John O'Rourke's letter); Exhibit D at 11 (Howarth Declaration). He crossed the border to the United States illegally and was apprehended on October 7, 2024. PSR ¶ 6. He was deported shortly thereafter. PSR ¶ 9. He then re-entered illegally. PSR ¶ 10. This choice may seem reckless, but O'Rourke had grown up moving frequently between England and Ireland in a culture premised upon itinerancy. PSR ¶ 50. Simply put, he did not fully appreciate the seriousness of his conduct at the time. With the benefit of hindsight, he acknowledges the seriousness of his breach of United States law was and deeply regrets his conduct

2. *Mr. O'Rourke continued to work and live in the United States*

Once in the United States, Mr. O'Rourke found a respite from the rampant ethnic discrimination against Travellers in the United Kingdom. He often traveled to locations in the United States where he and Ms. Price had distant relatives. As he went, he advertised his services for residential construction projects, including siding and roofing, relying on his experience working alongside his father since childhood and his formal training as a qualified bricklayer. PSR ¶¶ 58–59. The injuries he sustained in the car accident made much of the manual work difficult, so he worked

as a foreman and took on the role of finding new projects, purchasing materials, and communicating with clients. PSR ¶ 56. He managed to support himself and continue sending some money to his two children in the United Kingdom.

But Mr. O'Rourke's drinking and drug use also persisted during his time in America. Ms. Price later joined him, and the pattern of domestic disputes, driving violations, and evading responsibility continued. PSR ¶¶ 11, 35. While Mr. O'Rourke has never gotten involved in any conduct like the home burglary for which he was convicted in the U.K., he is facing pending state charges for larceny stemming from a dispute with a customer over a roofing project, as well as other misdemeanors. PSR ¶¶ 40–45. His arrest in that case triggered a federal arrest warrant for illegal re-entry, and he has been in detention since March 2, 2026. PSR ¶ 11.

### 3. Mr. O'Rourke's period of confinement has helped him reflect, receive treatment, and begin steps toward recovery.

Mr. O'Rourke understands that he cannot justify his decision to reenter the United States after his prior removal. In fact, he has expressed gratitude that this period in custody has offered him the time and space for self-reflection, as hard as it has been. Exhibit A (John O'Rourke's letter); Exhibit B at 2–3 (Adeline Casey's letter). For the first time since Nora's death, Mr. O'Rourke is clean and sober. He now understands that he cannot simply block out his pain or run away from his troubles. While in state custody, he has also ███████████████████████████████████████████████████████████████████████████████████████████████████████ Mr. O'Rourke's mental health has improved in significant ways, and he recognizes now that he was in "a really bad place" before his incarceration. Exhibit A (John O'Rourke's letter). He has been proactively seeking treatment and engaging with the (albeit limited) mental health support offered at MacDougall, underscoring his genuine commitment to getting help. Exhibit H at 3 (DOC Medical Records). In particular, Mr. O'Rourke feels immense

13

shame about his domestic violence toward Ms. Price, and he sees with painful clarity the impact that his anger, substance use, and decision to move away have had on his family, particularly his aging parents and his two young children. Exhibit A (John O'Rourke's letter); PSR ¶ 56.

When he returns home, Mr. O'Rourke intends to rebuild his life with a focus on maintaining his sobriety, finding steady employment, caring for his parents, and providing for his children. He plans to live with his mother initially. Exhibit B at 3 (Adeline Casey's letter). John's father has agreed to employ him in the construction business and help him continue building skills in payroll, client services, and field management to allow him to support himself despite his physical limitations. PSR ¶ 57; Exhibit A (John O'Rourke's letter); Exhibit B at 2 (John Casey, Sr.'s letter). Mr. O'Rourke understands that he needs counseling for domestic violence and anger management to regain the trust of Ms. Price and rebuild their relationship; if rebuilding is not possible, he needs these skills for any future relationship. Exhibit A (John O'Rourke's letter). Most importantly, Mr. O'Rourke aims to prioritize his children. *Id*. His starting point will be a return to the U.K. Probation Service, which will offer supervision and structure to assist in his rehabilitation. PSR ¶¶ 37–38.

Mr. O'Rourke has only just begun taking these important steps to transform his life. But his concrete plan is a cause for optimism that he can capitalize on this opportunity for change and move forward in a new direction.

## LEGAL ARGUMENT

The defense asks the Court to impose a Guidelines sentence of 0–6 months to run concurrently with any sentences arising from the pending state cases, except for ten days to run consecutively.[9]

---

[9] Mr. O'Rourke has agreed not to object to the imposition of a one-year term of supervised release. Doc. #21 at 5. Mr. O'Rourke understands that the Court will impose a $100 special assessment as part of his sentence,

**A. The governing legal standard requires the court to impose the minimally sufficient sentence to achieve the purposes of a criminal sentence.**

Pursuant to 18 U.S.C. § 3553, the Court is required to impose a sentence that is "sufficient but not greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2). Those purposes reflect the need for the sentence that is imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).

In every instance, the court must determine what kind of sentence best achieves these objectives by considering the following factors:

> 1. The nature and circumstances of the offense and the history and characteristics of the defendant;
> 2. The kinds of sentences available and the applicable sentence under the Sentencing Guidelines;
> 3. Pertinent policy statements issued by the Sentencing Commission;
> 4. The need to avoid unwarranted sentence disparities among similar defendants guilty of similar conduct;
> 5. The need to provide restitution to any victims.

18 U.S.C. § 3553(a)(1), (a)(3)–(a)(7).

If the Court believes a lower sentence would be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence). In Mr.

---

and he requests that the Court exercise its discretion not to impose a fine, as Mr. O'Rourke does not have the ability to pay a fine. PSR ¶ 63.

O'Rourke's case, a Guidelines sentence would fulfill the purposes of sentencing stipulated in § 3553(a)(2), whereas a longer sentence would not better accomplish these goals.

**B.  The parties and Probation agree that Mr. O'Rourke's Guidelines range is 0–6 months.**

Mr. O'Rourke pled guilty to Illegal Reentry under 8 U.S.C. §1326(a). He has affirmatively admitted to this offense conduct and taken full responsibility. The Presentence Report ("PSR") prepared by the Probation Office places Mr. O'Rourke in Criminal History Category I and calculates a Guidelines range of 0–6 months, which is the same as the calculation in the parties' plea agreement. PSR ¶ 65, Doc. #21 at 5.

Mr. O'Rourke promptly pled guilty pursuant to an early disposition ("fast-track") program authorized by the government, resulting in a four-level decrease of his offense level under U.S.S.G. § 3F1.1. In sentencing Mr. O'Rourke, the Court should take into consideration his decision to plead guilty so promptly, and his decision to agree to at least ten days of federal custody consecutive to his time in state custody to ensure that he will be transferred to Immigrations and Customs Enforcement and deported. These decisions have assisted the government and demonstrate acceptance of responsibility above and beyond a standard plea. It is also worth noting that Mr. O'Rourke's Guidelines range would have been 0 –6 months even without the reduction he received under § 3F1.1. In other words, his participation in the fast-track program did not result in a lowered Guidelines range and was not motivated by the Guidelines; the decision was driven by his desire to accept responsibility, assist the government, and be deported home to the U.K.

**C. A Guidelines sentence will fulfill the purposes of criminal sentencing under 18 U.S.C. 3553(a)(2).**

   1. *A Guidelines sentence reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense per under 18 U.S.C. 3553(a)(2)(A).*

A Guidelines sentence of 0–6 months reflects the seriousness of Mr. O'Rourke's illegally reentry offense. Mr. O'Rourke's crime of reentering the United States was one made of desperation, like many immigrants in the United States. This was Mr. O'Rourke's first reentry into the United States.

Federal immigration law protects the American public by ensuring that all people arriving in the United States are thoroughly vetted and submit to U.S. law. Mr. O'Rourke recognizes that his offense was a breach of federal law, and he quickly showed his willingness assist U.S. Immigration and Customs Enforcement to expedite his removal at the conclusion of his sentence.

A Guidelines sentence promotes the rule of law by underscoring that U.S. immigration law must be respected and that violations by anyone entering without permission will be prosecuted and punished. A Guidelines sentence also provides just punishment for the offense. During his detention, Mr. O'Rourke has been separated from his family and unable to see them. He missed the funerals of two cousins, one who died by suicide and another who was murdered. He has been unable to mourn for these beloved family members nor seek support from friends and family amid his grief. He has not been able to maintain regular contact with many of his family members and was unable to be present while his partner recovered from surgery. In short, the consequences of his confinement in the United States have already penalized him tremendously, and a Guidelines sentence is adequate to punish his behavior.

   2. *A Guidelines sentence will protect the public and adequately deter criminal conduct.*

A Guidelines sentence in this case will deter future criminal conduct and protect the public per the requirement of 18 U.S.C. § 3553(a)(2)(B)-(C). Mr. O'Rourke's experience in detention in a

17

foreign country over the past five months is an experience he never wants to repeat. He understands that if he ever illegally reenters the United States, he will face significantly more time in federal prison He has no strong ties to this country, and he intends never to return to the United States. Although this time in prison has been hard for Mr. O'Rourke, it has also forced him to "grow up" and taught him that he cannot simply "avoid" his troubles by running away, as his father put it. Exhibit C at 2 (John Casey, Sr.'s letter). Mr. O'Rourke now looks back on his rash decision to illegally reenter the United States as an immature response to the problems in his family life, his substance abuse, and untreated mental health struggles. In Mr. O'Rourke's case, the goal of specific deterrence has already been achieved during his time in custody.

Moreover, Mr. O'Rourke poses no risk to the public because at no point will he be released from custody in the United States. Per his Plea Agreement, he will be deported by ICE immediately after completing his sentence without ever re-entering the community in this country. Once back in the United Kingdom, Mr. O'Rourke will remain under the close oversight of public authorities and they will make the determination there about how to best manage the interests of their domestic safety. The duration of his sentence has no bearing on public safety in the United States. *See United States v. Chin Chong*, 2014 WL 4773978, at \*9 (E.D.N.Y. Sept. 22, 2014) ("It is reasonable to assume that Congress was concerned solely with the well-being of the American public when it enacted Section 3553(a)(2)(C). . . . The diminished need to 'protect the American public from further crimes of the deported defendant' argues in favor of shorter terms of incarceration.").

3. *The resources of the U.S. prison system will provide little rehabilitative value for Mr. O'Rourke as he awaits deportation.*

Much of his past conduct, including the instant offense, stemmed from Mr. O'Rourke's untreated mental health conditions and substance abuse. Mr. O'Rourke recognizes that he needs intensive psychological counseling, but studies have shown for decades that therapy is far less

18

effective when a clinician does not have awareness of a patient's culture.[10] In the United States, many people have never heard of the Irish Travellers, and Mr. O'Rourke has struggled to explain his story or the intense discrimination he faced in the U.K. The likelihood that a BOP counselor or programming has the adequate cultural context to provide effective therapy during his incarceration remains low.

In addition, Mr. O'Rourke understands that he needs more support to maintain his sobriety. Mr. O'Rourke turned to drugs and alcohol after his wife's death, and it profoundly affected him and those around him. Mr. O'Rourke is deeply ashamed of his substance abuse, but the past five months in detention have helped him understand the importance of sobriety. He understands that ongoing treatment and professional support will assist his recovery. While some BOP facilities offer sobriety programming, many noncitizen inmates are housed separately while serving federal sentences in facilities that offer far fewer services or treatment options. *See* Emma Kaufman, Segregation by Citizenship, 132 *Harv. L. Rev.* 1379 (2019). The fact that Mr. O'Rourke is awaiting deportation militates against extending his time in the U.S. prison system, where he is unlikely to receive the mental health and addiction recovery support he needs, particularly during a relatively short-term sentence. The rehabilitative aims of 18 U.S.C. 3553(a)(2)(D) will not be met by extending Mr. O'Rourke's custodial sentence, nor can they justify extending his sentence. *Tapia v. United States*, 564 U.S. 319 (2011).

---

[10]Derek Griner & Timothy B. Smith, *Culturally Adapted Mental Health Interventions: A Meta-Analytic Review*, 43 Psychotherapy: Theory, Rsch., Prac., Training 531 (2006), https://doi.org/10.1037/0033-3204.43.4.531; A. Soto et al., *Cultural Adaptations and Therapist Multicultural Competence: Two Meta-Analytic Reviews*, 74 J. Clinical Psychol. 1907 (2018), https://doi.org/10.1002/jclp.22679; Guillermo Bernal, María I. Jiménez-Chafey & Melanie M. Domenech Rodríguez, *Cultural Adaptation of Treatments: A Resource for Considering Culture in Evidence-Based Practice*, 40 Prof. Psychol.: Rsch. & Prac. 361 (2009), https://doi.org/10.1037/a0016401.

**D. Mr. O'Rourke's history and characteristics, as well as the nature and circumstances of the offense, offer important context for his offense.**

Mr. O'Rourke's personal history and circumstances, as well as the nature and circumstances of his offense, weigh in favor of a Guidelines sentence under 8 U.S.C. §3553(a)(1). Mr. O'Rourke's life has been marked by the kinds of tragedy far too common among Irish Travellers. He experienced violence and discrimination from a young age and felt shame from his own community about his parents' separation. Forced to live on the margins of English society and struggling with changing economic conditions for Travellers, Mr. O'Rourke endured depression and isolation as a teenager.

After suffering a near-fatal car accident, he became unable to perform the bricklaying trade in which he had trained and had few other employment prospects during the pandemic. PSR ¶ 58; Exhibit E at 5 (Sussex Partnership NHS Foundation Trust Records). ██████████████ ████████████████████████████████ At just 22 years old, Mr. O'Rourke shut down. █████████████████████████████████ He did not pursue counseling or treatment seriously and instead began self-medicating with cocaine and alcohol. Mr. O'Rourke faults his own immaturity for this refusal to pursue treatment, but Irish Travellers, particularly young men, face profound stigma when trying to access mental health treatment, both from their own community and often from practitioners. Exhibit D at 10 (Howarth Declaration).

Mr. O'Rourke's decision to come to the United States was made during this personal low point. Mr. O'Rourke simply sought to run away from the problems caused by his substance abuse and new relationship. Although he can never again undertake the kind of bricklaying work in which he is certified, Mr. O'Rourke has worked in the construction field alongside his father since childhood and managed to continue working off the books in casual construction jobs in the United States. Here, he did not experience the same degree of discrimination as a travelling day laborer that he did in the

United Kingdom, so he chose to stay. Still, he continued to struggle with alcohol abuse and untreated depression, anxiety, and other mental health conditions and ignored repeated requests from his family to return to England.

To the extent that the PSR suggests that Mr. O'Rourke "has extensive domestic violence history including rape, kidnapping, threats to kill, stalking, domestic violence," these allegations are unsubstantiated, unreliable, and appear inconsistent with Mr. O'Rourke's criminal record. PSR ¶¶ 36, 39; *compare* Exhibit I. The defense objects to the inclusion of this paragraph in the PSR. While Mr. O'Rourke does have a criminal record in the United Kingdom—and the Court is authorized to consider that fact in the § 3553 analysis—there is no evidence of any charges, much less convictions, for rape, kidnapping, threats to kill, or stalking. Nor is there any information in the discovery or elsewhere that corroborates these allegations, which appear in the Interpol report but have no apparent credible source. Similarly, there is no evidence to corroborate the allegation that he "has warnings for firearms (thought to be an associate he was with who had the firearm)." PSR ¶ 39. The most serious offenses in Mr. O'Rourke's criminal record involved burglary and theft committed at age seventeen. His one domestic violence conviction is a conviction for battery, in the context of a domestic dispute with his partner, for which he received a 12-week sentence.

Overall, Mr. O'Rourke's history and characteristics weigh in favor of a Guidelines sentence. A specific and tragic set of circumstances led Mr. O'Rourke to break the law and reenter the United States. He swiftly cooperated with federal authorities following his arrest. He has no strong ties in the United States and is determined to seek treatment for his mental health, as well as counseling for his relationship and support for his sobriety. The constellation of factors that led Mr. O'Rourke to come to the United States in the first place will not lead him back here again.

21

### E.  A sentence in the Guidelines range will avoid unwarranted sentencing disparities.

Per 18 U.S.C. § 3553(a)(6), the court must factor in the need to avoid unwarranted disparities in sentencing "among defendants with similar records who have been found guilty of similar conduct." According to the United States Sentencing Commission, 71% of defendants convicted of illegal reentry in 2025 received a sentence within the Guidelines range. U.S. Sent'g Comm'n, *Quick Facts: Illegal Reentry* (2025): https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY25.pdf. Only 7% of all defendants sentenced for illegal reentry received an upward variance. *Id.* Nothing about the nature or circumstances of his specific offense conduct warrant such an uncommon disparity. If anything, Mr. O'Rourke's personal circumstances offer mitigating reasons to give him a lower sentence.

The average sentence for all people convicted of illegal reentry in 2025 was 10 months. *Id.* The 10-month average includes every individual convicted of illegal reentry and is driven up by those with far more substantial and serious criminal records than Mr. O'Rourke, as well as those who have repeatedly reentered illegally. At offense level zero and Criminal History Category I, Mr. O'Rourke is among the lowest level of offenders, and his Guidelines range rightfully falls well below this average.

### F.  Mr. O'Rourke's sentence ought to run concurrently with any pending state sentences, aside from ten days to run consecutively.

Mr. O'Rourke requests that the Court exercise its discretion to run Mr. O'Rourke's federal sentence concurrently with any anticipated sentences from the pending state charges, aside from ten days to run consecutively. The government has agreed not to object to this proposal, as the shared priority among all parties is the swift departure of Mr. O'Rourke from the United States. Doc. #21 at 6.

*1. The court has discretion to run the sentences partially concurrently.*

Mr. O'Rourke has been in the custody of the Connecticut Department of Correction since March 2, 2026, a period of nearly six months by the date of his sentencing, facing state charges that he is working towards resolving but which will remain unresolved at the time of his federal sentencing. *See* PSR ¶¶ 40–45. The provisions in § 5G1.3(a)-(d) do not provide guidance covering Mr. O'Rourke's precise scenario as he faces anticipated state sentences for conduct that is not necessarily relevant to the instant case under the terms of § 1B1.3. However, the Background Note contemplated that some cases might fall outside the scope of the guidance and thus reiterated that the court "generally" has discretion to determine whether to run sentences concurrently or consecutively under both 18 U.S.C. § 3584(a) and *Setser v. United States*, 566 U.S. 231, 236 (2012). The Background Note in § 5G1.3 directs the court to determine whether to run sentences concurrently or consecutively through a consideration of the § 3553(a) factors.

In *United States v. Olmeda*, 894 F.3d 89, 93 (2018), the Second Circuit endorsed an expansive view of district courts' discretion over sentencing. In *Olmeda*, the Court of Appeals noted that when considering how to run a federal sentence in conjunction with an "anticipated term of imprisonment," "an 'anticipated state sentence' must, at minimum, encompass sentences associated with state charges for relevant conduct that are pending at the time of the defendant's federal sentencing." *Id.* at 93. While this definition set a floor, it did not indicate a ceiling that would exclude unrelated state charges pending at the time of a defendant's federal sentencing. Indeed, the inclusion of the phrase "at minimum" anticipated other configurations of pending state and federal charges, as in Mr. O'Rourke's current case, and left the door open for courts to use their discretion in these instances. The decision quoted broader language from the Fourth and Fifth Circuits, affirming district courts have discretion over whether to run federal sentences consecutively or concurrently "with any

23

sentence ensuing from pending state charges." *Id.* (citing *United States v. Looney*, 606 F. App'x 744, 748 (5th Cir. 2015); *United States v. Tysor*, 670 F. App'x 185, 186–87 (4th Cir. 2016)). When the court is sentencing a defendant in a federal case who is facing state charges that have not yet resulted in a conviction, the court has the discretion to run the federal sentence concurrently (or consecutively, or partially concurrently) with any sentence ensuing from the pending state charges.

*2. Mr. O'Rourke's status as a noncitizen facing deportation will prolong his time served.*

Mr. O'Rourke's request to serve ten days consecutively reflects his willingness to assist Immigration and Customs Enforcement in its swift execution of his removal, and to eliminate any risk that the Connecticut Department of Correction will fail to transfer him to ICE custody at the conclusion of his state sentence. This ten-day period ensures the smooth change in custody from state custody to the Bureau of Prisons and finally to ICE. Once he is in ICE custody, Mr. O'Rourke will remain in detention for an indeterminate amount of time. Noncitizens have very little ability to forecast just how long they will be in ICE custody and just how difficult the conditions will be. All we can say with certainty is that Mr. O'Rourke will end up serving time beyond his federal and state sentences as he awaits his deportation—which equates to consecutive time above and beyond anything this Court will impose.

Moreover, certain avenues towards time credits are unavailable to noncitizens serving sentences for illegal reentry. Under the First Step Act, federal inmates can earn time to reduce their sentences through a variety of programs. 18 U.S.C. § 3632(d)(4)(D). However, individuals subject to deportation are ineligible to apply time credit "if the prisoner is the subject of a final order of removal under any provisions of [ ] immigration law[.]" 18 U.S.C. § 3632(d)(4)(E)(i). Courts have consistently held that inmates who are subject to a final immigration order of removal are not eligible to apply FSA credit. *See Chang v. Flowers,* No. 3:25-CV-01838 (VDO),

24

2026 WL 788008, at *3 (D. Conn. Mar. 20, 2026); *Churuk v. Warden, FCI Danbury Bureau of Prisons*, No. 24-CV-01306 (VDO), 2024 WL 4695839 at *2 (D. Conn. Oct. 21, 2024); *Cheng v. United States*, 132 F.4th 655, 659 (2d. Cir. 2025) (holding that noncitizens with final orders of removal are not eligible for earned time credits). As a noncitizen subject to an order of removal, Mr. O'Rourke will serve the entirety of his sentence without the possibility of FSA earned time credits.

## CONCLUSION

By the time of his federal sentencing, Mr. O'Rourke will have been in state custody for nearly six months. This period of imprisonment has driven home to Mr. O'Rourke the importance of being present for his family and community in the United Kingdom. He regrets his decision to come to the United States as an immature attempt to avoid his problems and has no intention of ever returning here. But the most important work for him can only be done in the United Kingdom. He understands that he has a lot to answer for once back home and he intends to do just that. A Guidelines sentence of 0–6 months to run concurrently with any anticipated state sentences, aside from ten days to run consecutively is fair, just, and reasonable punishment for his crime of illegal reentry and furthers the parties' mutual goal of his swift departure from the United States.

Respectfully Submitted,

THE DEFENDANT,
John O'Rourke

FEDERAL DEFENDER OFFICE

Date: August 6, 2026                    */s/ Carly Levenson*
                                        Carly Levenson
                                        Assistant Federal Defender
                                        265 Church Street, Suite 702
                                        New Haven, CT 06510
                                        Phone: (203) 498-4200
                                        Bar No.: phv09665
                                        Email: carly_levenson@fd.org

        Assisting on the memorandum:    Alyssa Penick, Law Student Intern

26

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 6, 2026, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Carly Levenson*
Carly Levenson
