# EXHIBIT D

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

**Academic Credentials and Research Experience**

My name is Anthony Howarth and I am a social anthropologist specialising in nomadic groups in Asia and Europe. Much of my research has been concerned with Irish Travellers. Regarding my academic credentials, I hold an MA in Social Anthropology from the University of Bristol (Distinction), a BSc in Social Sciences from the University of Bath (First Class) and a PhD in Social Anthropology from the University of Cambridge. Following my doctoral studies, I received the ESRC Postdoctoral Fellowship at the School of Anthropology and Museum Ethnography, at the University of Oxford. Since 2022, I have held the positions of Research Fellow and Course Tutor at the Oxford Institute of Population Ageing (OIPA), and Research Affiliate at the School of Anthropology and Museum Ethnography, both at the University of Oxford. I have also taught anthropology at Oxford's Institute of Human Sciences and at Oxford and Cambridge University Colleges. In addition, I have been a Research Associate at University College and a College Advisor at St Antony's College (both at the University of Oxford). I, furthermore, have held the position of Admissions Tutor in anthropology at Oxford's Keble College (for archaeology and anthropology undergraduate entrance 2021-2025).

My academic interest in Gypsies, Travellers and Roma began when I was an undergraduate and I subsequently wrote three theses on these groups (BSc, MA and PhD). For my doctoral dissertation I focused on Irish Travellers and conducted research in Ireland, Italy and the UK. The latter's focus centred on familial dynamics and Irish Travellers' relationship with the State. My work has been published in high-ranking publications (including in *Current Anthropology*, considered the leading broad-based anthropology journal) and academic presses. I have also presented my research at leading international conferences and at seminars at many illustrious universities. In addition, I have given a key note address at the University of Cambridge, and have collaborated with many leading scholars in broader social science-based fields.

Beyond academia, I have worked with a number of NGOs and with legal actors on policy-related issues affecting Gypsies, Travellers and Roma. While in this role, I also contributed to a number of research projects and published reports.

**Sources Reviewed**

In preparing this declaration for Assistant Federal Defender Carly Levenson in connection with the matter *United States v. John O'Rourke*, I reviewed the following documents, which were provided to me by Attorney Levenson, in addition to the academic sources listed in the bibliography:

- Criminal Complaint and Affidavit, dated March 4, 2026
- Plea Agreement, dated May 17, 2026
- Presentence Report, dated July 29, 2026
- Social history prepared by Federal Public Defender Office, dated June 18, 2026

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

**Who are Irish Travellers?**

The United Kingdom and Ireland have been home to a number of Traveller and Gypsy groups from at least the early sixteenth century (Fraser 1995). While ethnonyms (external labels applied to ethnic groups), have a tendency to collapse together what, in actuality, are significant inter-group differences, it is generally accepted that Irish Travellers (*Pavee/Mincier*), Romany Gypsies, Scottish Travellers (*Nawkins*), New Travellers, and European Roma comprise the main resident groups in the UK (Clark & Greenfields 2006). Despite some intergroup marriage, Irish Travellers are distinct and have their own history, cultural practices, and language (Gmelch and Gmelch 1978, 1988; McCann et al. 1994; Helleiner 2000). Irish Travellers, while sharing a history with their non-Traveller counterparts in the UK and Ireland, also consider themselves to be distinct from the latter.

Irish Travellers have historically experienced and continue to face widespread discrimination from the British and Irish States and their broader host societies. They are also subjected to commonly held stereotypes pertaining to their 'criminogenic' and 'lawless' proclivities. In fact, the latter are so pervasive that it is often difficult for non-Travellers to disentangle myth from reality. The result of this is that discourses pertaining to Irish Travellers are not only shrouded in damaging, and often erroneous, depictions but have also acted to justify their harsh treatment from governments.

**The Situation of Gypsies, Roma and Travellers in Europe and Beyond**

Beyond academia, little is known about the actual lives of Gypsies, Roma and Travellers. One thing is certain, however, that these communities are some of the most disadvantaged in Europe, Asia, and the Americas. This means that they have suffered widescale historic discrimination which has led to damaging discourses and stereotypes that have severely affected their lives. For example, Gypsies, Roma and Travellers are widely depicted as being 'dirty', 'primitive' and 'criminogenic' and, as such, are thought of as being unable to conform to the values and practices decreed by civil society. One pervasive stereotype is that individuals from these groups are little more than wild animals whose behaviour is socially impeded by 'inbreeding', 'tribalism' and 'criminality'. To demonstrate the extent of this form of negative, and often erroneous, stereotyping, mass-media depictions regularly portray Gypsies, Travellers and Roma as vagrants who prey on the vulnerable, defecate in public places, and engage in multifarious forms of violence. For example, media commentaries report, often with little or no evidence, that Travellers move around at will threatening anyone they come into contact with. Such depictions, and the pervasive scapegoating of these groups, has resulted in them experiencing multifarious harms such as high rates of suicide and a whole host of mental health conditions. These negative depictions have also led to their insularity and a widespread distrust of the non-Traveller-Gypsy world (particularly anyone associated with the state and law enforcement).

Despite their forebearers originating in Ireland, many Irish Travellers were raised in

2

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

diasporic settings in the UK and the USA. Although Irish Travellers' experiences in the UK and Ireland often diverge, out-migration has not affected one of their most significant institutions; their marriage practices. Family, for Irish Travellers, is the hub around which all else revolves and is, therefore, of preeminent importance. For Irish Travellers, surnames are important identity markers which orientate individuals within their family network.

Surnames are also fiercely defended; to insult an individual because of their alleged improper conduct has social consequences, often risking their family's reputation being damaged. This means that there are high levels of social control within and between extended family groups. In contrast to the commonly held stereotype that Irish Travellers are 'criminogenic' and 'lawless', their behaviour is highly regulated by normative prescriptions that guide and, very often, govern conduct. Without providing a blanket justification for illegal activity, there are historical reasons that ought to be considered when attempting to understand Irish Travellers' criminality. These will be discussed in more detail after the following section on Irish Traveller history.

**Irish Traveller History**

As many Irish Travellers are non-literate, they possess little written history. However, this has not prevented non-Travellers from speculating about their origins. There are three distinct histories in this regard. Preponderant among these, is that Irish Travellers are the descendants of the settled Irish who took to the roads in order to escape the privations of the Great Famine of 1845-49 (Gmelch and Gmelch 1978, 1988). From this perspective, Irish Traveller history, if indeed it is recognised as such, is thin in temporal depth with them being no more than a few generations removed from the house-dwelling Irish (Ní Shúinéar 2004). There is no room to comprehensively describe the multifarious harms that have ensued from this perspective. However, suffice it to say here that it caused Irish Travellers to be imagined as failed Irish people who were in need of rehabilitation back into Irish society. Consequently, this perspective provided the rationale for the state sedentarisation projects described below (Ní Shúinéar 2004).

The 'drop out theory', as it has become known, was also used by the Irish government to deny Irish Travellers ethnic status until 2017 (1997 in the UK). This meant that they had no recourse to protection under race relations legislation, despite experiencing ethnic discrimination on a regular basis (Helleiner 2000). Conceived in this way, Irish Travellers, according to historian Paul Delaney, were positioned as being out of place vis-à-vis the broader Irish society (2011).

 A further perspective, more ennobling but still implying the sedentary origin myth, is that Irish Travellers are the descendants of the Irish nobility, forcefully evicted from their estates by Oliver Cromwell's troops during the 1650s. In a similarly romantic vein, the third historical approach is that Irish Travellers are descended from itinerant bards and musicians who roamed Ireland, bringing news and entertainment to remote rural hamlets. However, recent research conducted on Irish Traveller DNA by the Royal College of Surgeons in Ireland and the University of Edinburgh, has challenged some of these perspectives. The findings from this study demonstrate that Irish Travellers are a distinct ethnic group, who split away

3

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

from the settled Irish during the mid-Seventeenth Century (Gilbert et al. 2017). Although the dates from this study correspond to the Cromwell's colonial project in Ireland, there is evidence that Irish Travellers originated even earlier during the Plantagenet of Ulster in the 1500s. The most important thing to consider here is that all of the abovementioned perspectives not only reveal historians' fascination with the dramatic, but also their ambivalence towards Irish Travellers' 'nomadism' (Helleiner 2000: 44). In the drop out and dispossession theories 'nomadism' is considered as inherently deviant; as something which is begrudgingly undertaken by those with little other choice. Conversely, in the wandering bard theory Irish Travellers' nomadism is romanticised. The demonization and romanticisation of nomadism are prevalent themes in popular imaginaries and media representations of Travellers. This, Leahy suggests, has resulted in them being subjected to racist hostility and essentialist fascination, both of which are founded on discourses that depict Travellers as placeless strangers that do not fit into broader Irish society (Leahy 2014). In view of this, Irish Travellers found themselves caught up in a socio-political blame game that not only classified their cultural practices as inherently deviant but also placed them beyond the pale of mainstream society. Such marginalisation, and the endemic discrimination that ensued from this, have had enormously negative effects, a topic that we will turn to below.

**Migration to the United Kingdom**

Up until the latter part of the twentieth century, Ireland was predominantly a rural society. This meant that most people earned a living by engaging in practices such as farming and transhumant pastoralism; moving animals from place to place. At this time, Irish Travellers were little different from their non-Traveller counterparts, engaging in mobile farm work, animal trading, and making and selling artisan wares to farming communities throughout Ireland. Due to changes in Irish society wrought by the mechanisation of farming (and subsequently a reduction in the manual labour required to conduct agricultural work), many Irish Travellers migrated to the UK during the late 1960s and early 1970s. Although they made repeated visits back to Ireland to visit family members still resident there, these migrants began to build lives abroad. The latter necessitated the ability for them to earn a livelihood in their new homes. Irish Travellers subsequently engaged in the recycling of scrap-metal and providing services such as repairing tools and utensils, traveling door to door. The latter practice is known as 'hawking' and it is central to how many UK-based Irish Travellers still earn a living.

Due to widespread de-industrialisation in UK urban centres, scrap-metal was plentiful and Irish Travellers were able to earn a decent livelihood from this trade. The abundance of these economic resources was complemented by the ample space for encampments that the post-industrial sites provided. Although these places were often highly polluted, they afforded Irish Travellers the ability to live together in extended family groups and engage in trade. During the 1990s, swathes of industrial land in the UK became earmarked for redevelopment, which meant that many of the 'stopping places' traditionally used by Irish Travellers to set up encampments were obliterated. This meant that it became increasingly

4

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

difficult for these groups to continue with their mobile lifestyle. That notwithstanding, it was not just deindustrialisation that transformed Irish Travellers' cultural practices.

**Legislation and Discrimination in the United Kingdom**

Nomadism had long existed in the UK, with different groups of Travellers and Gypsies moving around, engaging in economic activity and establishing familial relationships through visiting annual fairs throughout the country. Different groups also crossed the English Channel and the Irish Sea to engage in trade, to escape from persecution in their home countries, and to visit relatives residing abroad. Since the dawn of the Industrial Revolution anti-vagrancy laws came into effect in the UK and continental Europe. These sought to prevent what were then known as the 'undeserving' and 'unproductive' poor from traveling from their home parishes to seek alms in other areas through begging and informal labour. This meant that, because Gypsy and Traveller mobility was, at that time, viewed as being akin to vagabondage, these groups were lumped in with the mobile poor and classified as vagrants. Consequently, Gypsies and Travellers came to the attention of the British State, whereby their mobility was now viewed as a social problem which required legislation to curb their purported habit of aimlessly wandering from place to place. The important thing to emphasise here is that once Gypsies and Travellers were classified as 'vagrants', they were transformed from being a curious social anomaly to an aberrant underclass who were considered to threaten the order of British society (Howarth et al. 2024).

To better understand the situation of Irish Travellers in the UK, we must once again return to Ireland. Following independence in 1922, the newly established Irish Republican Government, led by Premier Éamon de Valera, set out to 'modernise' Ireland. This meant that Ireland was to be transformed from being a 'backward' country, often with more in common with the Global South, to being a productive modern nation. These transformations brought the question of what to do about Irish Travellers to the forefront of the Republican nationalist agenda (Ò hAodha 2011).

In 1963, the Irish State initiated The Commission on Itinerancy, a social program in which specially appointed researchers travelled throughout Ireland to learn about Irish Travellers. The purpose of this endeavour was to find a 'solution' to the growing numbers of Travellers encamped on land and living in what the Commission considered as conditions of extreme privation. As a contextual background, Travellers had in fact encamped on land throughout Ireland for centuries. However, due to increasing numbers of Travellers residing in urban centres, they became particularly visible and, as such, were identified as a social problem in need of amelioration. Moreover, due to the Republican Government's drive to modernise Ireland, uniting the country through generating a widespread sense of national identity, Travellers were viewed as an anachronism; an uncomfortable reminder for the State, and its burgeoning non-Traveller national population, of a 'backward' Irish past that they wanted to leave behind. Although discrimination and anti-Traveller attitudes had already existed, it was during this period that anti-Traveller sentiment intensified and became more widespread. What occurred in Ireland was that Travellers were pushed further from the

5

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

mainstream by racialised depictions in the media and society alike that categorised them as social deviants who had no regard for a modern nation. Consequently, the State, by deploying the drop out theory, introduced assimilation policies to 'reincorporate' Irish Travellers 'back' into Irish society and through doing so, ameliorate their apparent plight. While this appears to be a worthy goal, what the Irish State failed to understand is that Irish Traveller privation had more to do with the structural effects of historical marginalisation than it did with endogenous cultural practices. Therefore, due to increasingly hard-line assimilatory policies and because of a diminishment of economic opportunities on account of the mechanisation of farming, similar to their non-Traveller counterparts, many Irish Travellers crossed the Irish Sea in search of a better life.

At this time, the British State was also involved in seeking a 'solution' to what it considered its Traveller-Gypsy 'problem'. To cut a long and complex story short, the British State, inspired by the Irish Commission for Itinerancy, began to eradicate what were referred to by Travellers and Gypsies as 'stopping places' (parcels of land used for encampments often located on land that was either viewed as unproductive or classified as non-residential). Similar to the Irish case, there was an overriding sense that UK-based Travellers and Gypsies were living in conditions of privation that were unacceptable and even inhumane for a developed nation.[1] The then Labour Government, as a purported solution to the ostensible Traveller-Gypsy problem, devised and subsequently implemented the Caravan Sites Act 1968. The Act's purpose was to either move Travellers and Gypsies into housing or to alleviate their supposed plight (living without amenities such as piped water, electricity, and refuse services) through providing them with accommodation on specially built sites in which they could station their trailers/caravans. The aim was that Travellers and Gypsies would quickly realise the advantages of abandoning their supposed 'nomadic inclinations', informal economic practices, and lack of formal education, and seamlessly assimilate into the wider UK population. This was a developmentalist logic used by colonial powers and benevolent first world nations the world over, that more often than not failed to realise its designers' intentions. (See for example, the plethora of development literature to substantiate this statement).

Returning to the Caravan Sites Act 1968: The problem was that, while government funds were made available, local councils not only lacked the political will to build sites but failed to exercise their responsibility to do so. Here, most local councils, employing something akin to a utilitarian calculus, favoured majority interests—consisting of people who comprised their prospective electorate—over those of a minority. Consequently, local councils evaded their duty to build enough Traveller and Gypsy sites. Furthermore, when sites were built or when planning permission was applied for, a public outcry usually ensued. The situation was not helped by sensationalist mass-media headlines and the associated concerns regarding Traveller sites being correlated with reductions in property values. To summarise a long and complex process, the benevolent aims of the Caravan Sites Act 1968 failed to realise their

---

[1] For context, it ought to be stated that akin to their Irish counterparts, Travellers and Gypsies living in the UK had also suffered the effects of structural conditions from at least the Medieval period onwards. For example, under the reign of King Henry VIII it was not simply legal to hunt and kill Gypsies but this practice was widely considered as a sport akin to hunting deer and other game animals.

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

designers' intentions and hardly any sites were built. For Britain's Travellers and Gypsies, who had been coerced off the road by the promise of a better life, the whole situation was a disaster which left them in a far worse position than the one they previously experienced.

Stuck between a rock and a hard place, with traditional stopping places rapidly reduced and no alternative sites being built, Travellers and Gypsies were faced with little other choice than to move into bricks-and-mortar housing or to keep moving from place to place. The problem was that, in the wake of the Caravan Sites Act 1968, Travellers faced tougher measures from local authorities who, instead of tolerating their use of Britain's common land as they previously had done, began evicting them more regularly. This meant that it was more difficult for Travellers to sustain familial relations through living together in larger encampments. It also meant that economic practices shifted as land tenure was reduced, resulting in a scarcity of work. Although a series of other legislative acts followed in the wake of the 1968 Act, it was not until 1994 that the British State implemented the Criminal Justice and Public Order Act 1994 (CJPOA). This represented a watershed for UK-based Travellers and Gypsies.

Many commentators suggest that the CJPOA 1994 was implemented to prevent unauthorised 'raves'. However, this position disregards the long history of what has been described as 'anti-Traveller legislation' (Howarth 2026). As we have seen, while the State had long attempted to prevent Britain's Travellers and Gypsies from engaging in cultural forms of mobility, the CJPOA 1994 was pivotal in transforming the lifeways of these communities. In contrast to its predecessor the Caravan Sites Act 1968, which was premised on the basis of benevolent assimilation, the CJPOA 1994 was more punitive; widely categorised as 'draconian' by legal scholars (Johnson and Willers 2007).

The CJPOA 1994 provided local councils and the police with greater powers to evict Travellers and Gypsies from land and was a major contributary factor in their widescale sedentarisation in the UK. For example, through implementing particularly punitive sections of the Act (77-78), police could evict Travellers and Gypsies immediately without authorization from a court of law (Johnson and Willers 2007). If incompliant, Travellers and Gypsies could be forcibly removed from land; their property, including the trailers in which they lived (and were their homes), impounded and even destroyed. Travellers and Gypsies could also be imprisoned and/or fined.

The draconian controls in sections 77-78 of the CJPOA 1994 were eventually moderated by a series of judicial reviews and appeals in the UK High Court. Consequently, a legal space was opened up enabling groups with cultural practices based around mobility to continue to live this way. That notwithstanding, the damage had already been done. Over the last three decades the threats, effects, and enforcement of the CJPOA 1994 have taken their toll and many Travellers and Gypsies were left with few options other than to adopt a more sedentary existence, and now largely reside in housing, on state-managed sites, or on privately owned land.

It is important to emphasise the effects of the CJPOA 1994 on Traveller and Gypsy lifeways in the UK. Since the mid-sixteenth century the latter have lived in the UK moving from place

7

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

to place to avail themselves of economic opportunities. However, it was not until the implementation of the CJPOA 1994 that this was irrevocably changed. If we are to believe in the enshrined human right to cultural self-determination (as outlined in Human Rights discourse), as is the case in the UK, the CJPOA 1994 represents an infringement of this principle. If this were not enough, under certain sections of the Act, Travellers and Gypsies were to be provided with particular allowances in order to preserve their cultural preference for living with their family in trailer accommodation. This consisted of the reduction of planning restrictions regarding living in caravans, allowing Travellers and Gypsies to buy and subsequently live on their own land with their families. Consequently, this did not happen and most Travellers and Gypsies were for all intents and purposes abandoned by the State; left to fend for themselves unable to navigate planning laws and other legislation that was levelled against them.

**Deprivation and Structural Disadvantage**

*Education*

It is widely supposed that Irish Travellers are uneducated due to a lack of formal schooling. In many ways this suggestion is misleading as individuals from this community are educated into what are known as 'Travellers' ways' from birth onwards. Once Irish Traveller men reach the age of around twelve-thirteen years old they start accompanying their fathers to work. This activity is akin to an apprenticeship whereby male adolescents learn how to earn a living through engaging in informal economic activities such as scrap metal recycling, small-scale construction work, and trading vehicles and other commodities.  A more accurate suggestion, therefore, is that although many Irish Travellers may not be formally schooled, they do receive an education based on Travellers' particular ways of earning a living.

In the UK and Ireland, it is a legal requirement that all school age children engage in formal education. Irish Travellers are no different in this regard. However, there are certain legal dispensations whereby groups with cultural traditions pertaining to mobility are allowed to take time out of school to engage in cultural practices such as travelling to attend weddings, funerals, and horse fairs. These days many Irish Travellers attend school. However, due to their marginalisation, many attend schools located in disadvantaged neighbourhoods where delinquency and inter-ethnic violence are commonplace. Irish Travellers are particularly prone to discriminatory treatment; singled out at school and subsequently many are bullied. A common occurrence is that Irish Traveller adolescent males attend school, receive threats of and/or actual physical violence from their non-Traveller counterparts and defend themselves through retaliation. Due to their boxing training, Traveller adolescents are often proficient combatants. However, this is a double-edged sword and often results in Travellers being blamed for the conflict and expelled from school. Although for those who have been bullied this is often a huge relief, it means that Traveller male adolescents are stuck between a rock and a hard place when it comes to gaining a formal education.

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

*Employment*

Due to their lack of schooled education and with no formal qualifications, Irish Traveller males are left with little choice other than to engage in informal economic activities. This means that they have to live on their wits engaging in flexible multi-occupational activities in order to secure employment. Although a decent living can be made this way, Irish Traveller men often experience periods where work is scarce.  When this occurs, some may be tempted by engaging in criminal practices to ensure that their families have necessary subsistence. When this requirement is coupled with Irish Travellers' attitude that the non-Traveller world is largely against them, a justification is provided for engaging in what many people would consider to be immoral and illegal behaviour. This lack of formal employment opportunities along with the commonly held belief that Irish Travellers are here today and gone tomorrow may account for why they are grossly overrepresented in the criminal justice system, including incarceration.

*Mortality and Morbidity*

Irish Travellers have some of the worst mortality and morbidity rates of any group in the UK and Ireland. Men fair the worst with life expectancy at around 61 (which is 15 years less than the general population). Women do not fare much better with life expectancy at around 70 (which is 11 years less than the general population). To put these figures into some kind of context, Irish Traveller men's life expectancy mirrors figures observed in Europe during the 1940s, whereas women's mirrors those of the 1960s (Abdalla 2010). Irish Travellers' morbidity and infant mortality rates are also much higher than the general population (14.1 per 1000 live births compared with 3.9 in the general population). These figures not only demonstrate that Irish Travellers die much younger than non-Travellers but also that they endure debilitating illness. Moreover, they also indicate that historical structural disadvantage plays a significant role in such stark outcomes.

Irish Travellers also have inordinately high rates of suicide, again with men fairing worse with rates seven times higher than the general population, whereas women's rates were five times higher.[2] In studies of Indigenous people, their high rates of suicide are explained by cultural loss and the consequent disconnection from traditional forms of life (Epstein 2019). Irish Travellers, who are widely considered as indigenous to Ireland, experienced similar situations to their Indigenous counterparts in the Brazilian Amazon or in North America. Following the CJPOA 1994, many Travellers and Gypsies were pushed from pillar to post by the British State; unable to set up camp without fear of reprisals. When this is coupled with their demonisation in the UK media, along with institutional racism and widespread social discrimination, it is little wonder that Irish Travellers experience high levels of psychosocial distress. There is hardly a Traveller family that has not experienced a close family member's suicide. This means that when the finger is pointed at Travellers' cultural practices, we are effectively blaming the injured party for attempting to keep their

---

[2] The highest rates of suicide are the Inuit and other First Nations groups. However, due to the difficulty of gathering accurate statistical information on Travellers and Gypsies, it is safe to suggest that current estimates regarding suicide are likely to be much less than actual figures.

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

heads above the rising tide that constantly seeks to engulf them.

Due to their distrust of formal institutions, particularly those connected to and/or part of the State, Irish Travellers often do not seek the support of mental health services. There are also high levels of stigma involved for an Irish Traveller to admit that they require external support. This is particularly the case for men who are expected to be extremely tough and, therefore, able to stoically endure any difficulties no matter how arduous they may be. Certain conditions, such as autism or ADHD, are also viewed with scepticism, with many Irish Travellers refusing to acknowledge medical diagnosis. I encountered this during my research when the grandmother of an adolescent male, whose doctor had diagnosed him with ADHD, refused to accept that this might account for why he was behaving erratically.

**Irish Traveller Culture**

Although categorising any culture is a complicated and contested endeavour (Williams 1976), we could say that Irish Traveller culture consists of particular beliefs, values, and practices. Foremost amongst these is endogamy, or what Travellers refer to as marrying within one's 'breed'. As aforementioned, this means marrying someone who is already related to you, often a variation of cousin. Although modern sensibilities might recoil at the very thought of such unions, it should be pointed out that many cultural groups still practice intense endogamy. Moreover, when the historical record is examined, we would soon discover that endogamy was formerly the rule across the world, rather than the exception. In this regard, due to how it binds families together through acting as the primary means for social and biological reproduction, marriage for Irish Travellers is the preeminent social institution. This means that family is the means through which beliefs, values and morality are inculcated into children and adults alike. Most Irish Travellers are strict Catholics. Therefore, when they consent to marriage and subsequently make matrimonial vows, these are taken with the utmost seriousness and sincerity. This means that marriage is usually for life, with divorce being rare and widely considered to be a moral failing.

Women's sexuality is also significant in its underpinning Irish Travellers' social and moral life. Irish Traveller women often model themselves on Mary, Christ's mother. The expectation is that virginity is strictly observed before marriage.  Following marriage, and in line with its vows, women devote themselves to their husbands and children. To emphasise the seriousness and extent of Irish Traveller sexual conduct and concomitant morality, holding hands before marriage with someone other than one's future spouse is widely considered to be improper as it counts as sexual contact. That notwithstanding, Irish Traveller women are held in high esteem so long as they remain chaste after marriage and abide by the practices and precepts contained in their particular form of Catholic morality. The importance of this cannot be overemphasised as it is one of the mainstays of Irish Traveller cultural life. Although divorce and contact considered sexual between unmarried men and women does occur, this does not affect the superordinate structure that acts as a guide, ordaining 'proper' conduct. Moreover, there are strict social controls in place to ensure that the latter is minimised and that transgressors receive sanction such as being socially ostracised through gossip and/or having their marriage opportunities affected through being viewed as impure.

10

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

The aforementioned expectations placed on women, which are often unrealisable, can result in all manner of harms. This is not to condone the kinds of gendered violence where men physically abuse their wives, which are cowardly and deplorable. However, Irish Traveller men are raised with unrealisable expectations regarding women's purity; a situation whereby if women fail to live up to the practices and precepts of Irish Travellers' forms of Catholic morality, domestic violence can and very often does ensue. Other forms of violence are ubiquitous among Irish Traveller groups and conflict is a common means for settling disputes. Although violence occurs between different families, intra-family violence is commonplace. This means that if a family member (usually an affine through marriage) engages in what is considered as improper conduct, sanctions (most often threats of and/or actual violence) may occur. The problem here being that the latter can and often does result in intra-family feuding, a situation where families are quite literally torn apart.

**John O'Rourke**

The preceding whistle-stop account of Irish Traveller history and cultural practices helps us to comprehend the contextual circumstances in which John O'Rourke is immersed, as well as how his culture has had some bearing on his behaviour.

As an Irish Traveller who was born in the UK during 1998, John O'Rourke would have spent his infancy living nomadically, or what Travellers term 'on the road', in and between roadside encampments. The fact that his family entered housing in 2004, indicates that a change had occurred. It is credible to suggest that this family entered housing because the CJPOA 1994 had left them with little choice other than to abandon their nomadic lifestyle and move into bricks and mortar housing. Their situation parallels the experience of many other UK-based Travellers and Gypsies who, due to the draconian measures contained in the CJPOA 1994, were effectively forced by the British State to abandon their mobile way of life and seek housing-based accommodation.

Although there is a temptation to (and many scholars have succumbed to its allure) solely lay blame at the feet of determinate historical and cultural circumstances, consideration must be given as to why some people surmount their historical marginalisation and their socialisation into particular cultural contexts. This is not to underestimate the influence that these historical conditions have on people's lives but to put into question why some people are unable to move beyond the grasp of particular cultural norms and values while others are not. Values, as commentators affirm, are difficult, if not impossible, to construct of one's own volition (May 2023). This is simply because of how they are socially produced (Graeber 2005). Most people who manage to move beyond the constraints that their traditions and cultural values encase them within, usually have access to significant people outside of their own social group.

Due to their historical marginalisation, Irish Travellers have had few opportunities to interact with non-Travellers beyond purely economic interactions. This means that, although they are familiar with certain areas of the non-Traveller world, they have not had much opportunity to consider its norms nor engage in its aspirations. Although John

11

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

O'Rourke completed high school, his life history demonstrates that he remains deeply embedded in Irish Traveller culture. For example, he married young to a Traveller woman, and as such had to find a way to provide for his family in the best way possible within his limited means. This is not to excuse his criminal behaviour but to emphasise that mitigating circumstances ought to be considered when examining his case.

Family for Irish Travellers plays a pivotal role in their lives. John O'Rourke's parents separated in 2009 when he was 11 years old. Parental separation is often a difficult experience for children. However, for Irish Travellers, marriage is a sacred union that binds families together within a moral framework that guides what they consider to be proper conduct. From this perspective, divorce and separation are more often than not viewed as aberrant. Furthermore, when Travellers make marriage vows these are to God and are, therefore, taken with the utmost seriousness and sincerity. The fact that these are uttered in front of their families strengthens their moral force; a promise to abide by their nuptial obligations for good or bad. To put this in no uncertain terms, for many Irish Travellers marriage is for life. This provides us with a means to understand John O'Rourke's refusal to divorce his previous partner and remarry his new partner, despite his wife's death. It also allows us to understand his current partner's family's outrage regarding this decision. It furthermore, demonstrates that he is acting within a moral framework, albeit one that may appear incongruous and/or old fashioned to those outside the Irish Traveller community.

While many people use alcohol and drugs recreationally, substance abuse is correlated with structural inequality. Such misuse, particularly heavy usage amongst the very young, is also correlated with the absence of male role models (Parker et al. 2009). While John O'Rourke did maintain contact with his father following his parents' separation, he would not have had the constant guidance and instruction that fathers normally provide in Irish Traveller families. Although the misuse of drugs and alcohol are becoming more commonplace, these activities are frowned upon by Irish Travellers. While there are intergenerational differences in attitude, the use/misuse of alcohol and drugs usually causes friction in Irish Traveller families. The fact that John O'Rourke started using alcohol and drugs at such an early age, in all likelihood would have led to problems within his extended family network. Although close family members will often forgive any infraction, it is often a different matter for in-laws who might blame their child's spouse for leading them astray and bringing shame on their family. It is important to reiterate that family is of prime significance for Irish Travellers and that intermarriage within an extended family group means that one's in-laws in all likelihood would already be family members. The upshot of this is that, if an Irish Traveller becomes estranged from their family, they would have few available options regarding who they could turn to for support.

At risk of labouring the latter suggestion, but in the interests of providing more context as to why John O'Rourke re-entered the USA: When Irish Travellers followed a more nomadic lifestyle, they used avoidance as a cultural practice. For example, if conflicts arose, they would simply move elsewhere and wait for the problem to abate. As we have seen, family is often the only support an Irish Traveller can turn to in times of trouble. This means that if conflicts arise, Irish Travellers cannot seek solace with other Traveller families. Moreover, because of historical conditions they would not consider seeking support from non-

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

Travellers. As aforementioned, the British and Irish States sought to legislate Travellers and Gypsies out of existence through assimilation and punishment. (They are furthermore, targeted for stop and search and incarcerated for petty crimes and are over represented in prison populations). This means that Irish Travellers are not only sceptical of seeking protection from the State but consider it an enemy to their way of life. As such, it would be an exceptional case for them to turn to the state for protection or support. (As we have seen, this also includes medical and social care services). John O'Rourke's decision to re-enter the USA should be viewed in this light. Under threat from his first wife's family, and seeking support from his own, he crosses the border between Canada and the USA.

**Suicide**

Suicide is endemic in Irish Traveller families. Although the reasons for this are complex, widespread ethnic discrimination, social isolation, and men's inability to exhibit emotions publicly are common factors.[3] In academic accounts, the Inuit of the Arctic Nunangat have the highest rates of suicide. These are attributed to rapid cultural change and the concomitant loss of practices, values and beliefs that result in feelings of alienation and widespread psychosocial distress (Epstein 2019). Irish Travellers also have inordinately high rates of suicide. The literature on this phenomenon is little understood. However, the material that does exist demonstrates that almost every family is affected by suicide.

 John O'Rourke's wife; his daughter's mother, died of suicide. This must have been devastating due to the central role women and mothers play in Irish Traveller society. The fact that he found her still alive, hanging by the neck, and failed to save her life, must have had a huge impact on his psychological state. One can only imagine how this would make an Irish Traveller man feel, due to their intense responsibility to protect and provide for their family. If this were not enough, there was a further suicide in this family with John O'Rourke's sister-in-law dying this way. Subsequently, and perhaps as a consequence of the psychosocial distress that is common amongst Irish Travellers, John O'Rourke's partner, Ellen, developed severe postpartum depression (and later, serious medical issues) and was unable to fulfil her maternal responsibilities. This, to put it in no uncertain terms, is perhaps the worst thing that can happen to an Irish Traveller woman and her family.

This suggestion brings us back to Irish Travellers' high rates of morbidity and low life expectation. As we have determined, mortality rates are inordinately high for Irish Travellers. Furthermore, although there are a range of comorbid factors involved, there is sound evidence demonstrating that structural issues also significantly contribute to their low life expectancy and high morbidity rates. John O'Rourke's tragic family history certainly acts as testament to this assertion.

Although John O'Rourke's story appears to be extraordinary regarding the misfortunes that he has experienced, it is not so very different to those of other Irish Traveller men. The fact is that, due to a range of interacting factors such as their widespread societal

---

[3] This inability is linked to hyper masculinity which Irish Traveller men have historically developed in order to preventing attacks from other Travellers and Gypsies and non-Travellers.

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

marginalisation and historic state-ordained persecution, Irish Travellers have had little choice other than to turn their attention inward, prioritising their cultural practices in order to endure. This means that their behaviour can often err on the side of illegality and/or informality: A situation in which an understandable distrust of the non-Traveller world, due to the very real effects it has had on their cultural practices, tends to deeply embed them within their own way of life.

14

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

**Bibliography**

Abdalla, S., Kelleher, C., Quirke, B., and Daly, L., 2013. 'Social inequalities in health expectancy and the contribution of mortality and morbidity: The case of Irish Travellers'. Journal of Public Health, 35(4): 533-540.

Clark, C. and Greenfields, M., 2006. *Here to Stay: The Gypsies and Travellers of Britain*. Hatfield: University of Hertfordshire Press.

Delaney, P., 2011. *A Sense of Place: Travellers, Representation, and Irish Culture*. Dublin: The Ireland Institute.

Epstein, H. 2019. *The Highest Suicide Rate in the World*. The New York Review of Books. Pp 1-10

Fraser, A., 1995. *The Gypsies*. Oxford: Blackwell. Clark, C. and Greenfields, M., 2006. *Here to Stay: The Gypsies and Travellers of Britain*. Hatfield: University of Hertfordshire Press.

Gilbert, E., Shai, C., Ennis, S., Wilson, J. F. and Cavalleri, G. L., 2017. 'Genomic Insights into the Population Structure and History of the Irish Travelers'. *Scientific Reports*, 7: 1-12. Available online: https://www.nature.com/articles/ [Accessed 27 June 2018].

Gmelch, G. and Gmelch, S., 1978. Irish Tinkers: When Wanderers Settle Down. *Human Nature,* 1(3): 66-75.

Gmelch, G. and Gmelch, S., 1988. Nomads in Cities. *Natural History*, 97(2): 50-61.

Graeber, D. 2005. Value: Anthropological Theories of Value. In Carrier, J. G. (Ed.), *Handbook of Economic Anthropology*. Cheltenham: Edward Elgar Publishing.

Helleiner, J., 2000. *Irish Travellers: Racism and the Politics of Culture*. Toronto: University of Toronto Press.

Howarth, A., Heiskanen, J., Steglich, S., Manchanda, N., and Bencherif, A., 2024. *'*Nomads' Land: Exploring the Social and Political Life of the Nomad Category*', International Political Sociology* 18(4): 1-24.

Howarth, A. 2026. (Forthcoming 2026). 'It's Only a Matter of Time? Eviction, Uncertainty, and Socio-Temporal Disorientation in an Urban Travellers' Camp', *Current Anthropology.*

Johnson, C. and Willers, M., 2007. *Gypsy and Traveller Law*. London: LAG.
Leahy, S., 2014. 'Demonising Discourse: The Traveller Community's Struggle Against the Elite Voice of RTE'. *Romani Studies*, 24(2): 165-204.

May, S. '*Foundations: Nietzsche's Conception of Values*', *Nietzsche's Ethics and his War on 'Morality'* (Oxford, 1999; online ed: Oxford Academic, 31 Oct. 2023), https://doi.org/10.1093/oso/9780198238461.003.0002 [accessed 11 July 2026].

**Declaration of Dr. Anthony Howarth**
**August 3, 2026**

McCann, M., Ó Siocháin, S., and Ruane, J., 1994. *Irish Travellers: Culture and Ethnicity*. Belfast: The Queen's University of Belfast.

Ní Shúinéar, S., 1994. Irish Travellers, Ethnicity and the Origins Question. In: M. McCann, S. Ó Siocháin and J. Ruane, eds. *Irish Travellers: Culture and Ethnicity*. Belfast: The Queen's University of Belfast, pp. 54-78.

Ò hAodha, M., 2011. *The Insubordinate Irish: Travellers in the Text*. Manchester: Manchester University Press.

Parker, K. F., and Maggard, S. R. 2009. 'Making a Difference: The Impact of Traditional Male Role Models on Drug Sale Activity and Violence Involving Black Urban Youth'. *Journal of Drug Issues*, *39*(3), 715-739.

Williams, R. 1976. *Keywords: A Vocabulary of Culture and Society.* Oxford University Press: Oxford.